# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DAVID CRAWFORD,
    Petitioner,

vs.

WARDEN, WARREN
CORRECTIONAL INSTITUTION,
    Respondent.

Case No. 1:10-cv-541

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Petitioner, an inmate in state custody at the Warren Correctional Institution in Lebanon,

Ohio, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The case

is before the Court on the petition and respondent's "Answer/Return Of Writ" with exhibits,

including the trial transcript. (Docs. 1, 9).

## I. PROCEDURAL HISTORY

### State Trial Proceedings

In November 2006, the Hamilton County, Ohio, grand jury returned a three-count indictment

charging petitioner with one count of aggravated murder in violation of Ohio Rev. Code §

2903.01(A) (Count One), one count of murder in violation of Ohio Rev. Code § 2903.02(B) (Count

Two), and one count of tampering with evidence in violation of Ohio Rev. Code § 2921.12(A)(1)

(Count Three); firearm specifications were attached to the aggravated murder and murder counts.

(Doc. 9, Brief, p. 9 & Ex. 1).[1]

The criminal charges stemmed from a shooting that occurred "on or about September 27,

---

[1]Specifically, the aggravated murder charge set forth in Count One alleged that petitioner "purposely, and with prior calculation and design, caused the death of WILLIAM WILSON;" and the murder charge set forth in Count Two alleged that petitioner caused the death of Wilson "as a proximate result of . . . committing or attempting to commit an offense of violence, to wit: FELONIOUS ASSAULT." (Doc. 9, Ex. 1). In Count Three, petitioner was charged with altering, destroying, concealing or removing "a certain document or thing, to wit: A FIREARM with purpose to impair its value or availability as evidence in [an official] proceeding or investigation." (Doc. 9, Ex. 1).

2004." (*See* Doc. 9, Ex. 1). In its direct appeal decision, the Ohio Court of Appeals, First Appellate District, provided the following summary of the facts that led to petitioner's indictment and subsequent conviction on all charges based on evidence presented at his trial:[2]

> David Crawford and William Wilson were acquaintances–they traveled with the same circle of friends. In late September 2004, Crawford and Wilson took a ride in Wilson's car, a black Mercedes. Although Crawford's story about why they took a car ride and what happened in the car changed between the time he first spoke with police and the time he testified, it is undisputed that Crawford shot and killed Wilson and left his body on a street in the Oakley section of Cincinnati.

****

### I. State Witnesses–Crawford's "Friends"

> Jeff Schulkers was a close friend of Wilson and an acquaintance of Crawford. He testified that he and Wilson had been partying with some girls on the night of the murder, at a hotel about a five- to ten-minute drive from the spot where Wilson's body was found. Wilson got a call on his cellular phone and left the hotel at around 9 p.m. Schulkers spoke with Wilson again on the phone at 10:30 p.m. Between 10:45 and 11 p.m., Schulkers saw Wilson in the front passenger seat of the Mercedes as it exited from I-75 into Roselawn, going west toward Hartwell. Schulkers did not see the driver. Schulkers spoke with Wilson right after he had seen him in the car, but Wilson did not answer any of several other calls that Schulkers made to Wilson that night.

> Donald Paul testified that Crawford had called him at around 1 a.m. to ask for a ride from the White Castle restaurant on W. H. Taft Road, which was a little over a block from where the Mercedes was found.

> Bill Maglecic was Crawford's landlord and distant relative. He testified that Crawford had given him a Glock 9-mm gun for him to sell in lieu of rent money (Maglecic had a potential buyer). About a week later, Crawford asked for the gun back, purportedly to go shooting on a farm with his cousin and to clean it. A few days later, Crawford returned the gun and told Maglecic that the gun was too much trouble for him, that he did not want to see the gun again, and to "get rid of it."

---

[2]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Because petitioner has neither cited nor presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted herein, the state appellate court's factual findings are presumed to be correct. *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

DJ Wittekind was a close friend of Crawford[].  He testified that he had witnessed an argument between Crawford and Wilson at a bar, and that afterwards both men had appeared very upset.  Wittekind heard Crawford say that he would "take care of the incident" and "do [Wilson] dirty."  Prior to the murder, Wittekind met Crawford at Target World, a shooting range.  Crawford and Wittekind shot each other's guns.  While there, Wittekind showed Crawford how to disassemble his Glock and clean it.  After Wilson's murder, Wittekind overheard Crawford telling another friend that he had "done someone dirty."  Wittekind, worried that his fingerprints might have been on the murder weapon, told a police officer what he knew.

Adam Giles was a close friend of Crawford[].  He testified that, before the murder, Crawford had told him on two occasions that he was going to kill Wilson.  And on the same day that Crawford told Giles the second time that he planned to kill Wilson, Crawford had asked Giles if he could put a car in his driveway with a cover over it.

The night of the murder, Giles said, he had received five to ten calls from Crawford between 11 p.m. and 4:30 a.m.–Giles did not answer the phone.  About three weeks after the murder, Crawford approached Giles and told him that he had been driving the Mercedes the night of the murder, that he had told Wilson to look to his right, and that he had then shot him.  Further, Crawford told Giles that Wilson had wrestled with Crawford, and that Crawford had then pushed him forward and shot him again.  Giles said that Crawford attempted to draw him into other conversations about the murder, but Giles rebuffed his attempts.  He also testified that Crawford had told him that he had sold the murder weapon, the Glock, to his landlord.

Giles testified that, in November 2004, Crawford had threatened to kill him, so he called Crimestoppers and told them about Wilson's murder.  Giles had retained an attorney in an effort to avoid testifying against Crawford at trial.

Brian Luken was a close friend of Crawford[].  He testified that, in the early morning after the murder, Crawford had showed up at his house in Northern Kentucky in Wilson's Mercedes.  He was alone.  Crawford asked Luken to follow him somewhere.  Luken noticed in the waistband of Crawford's pants a bulge that he thought was a gun.  Luken refused to follow Crawford in his car because he had been drinking.

The next morning, after hearing that Wilson had been murdered, Luken retained an attorney to "make sure where [he] stood."  In subsequent conversations, Crawford described to Luken how he had murdered Wilson–that he had shot him in the face and kicked him out of the car.  Luken had to be subpoenaed to testify against Crawford.

Sonia Steger was an ex-girlfriend of Crawford[]. He was dating her at the same time that he dated a woman named Tara, who had since become his wife. Steger testified that, at Wilson's funeral, Crawford was wearing a shirt with Wilson's photograph on it, and that he later wore dog tags in Wilson's memory. Steger testified that, in one conversation, Crawford had told her that a black man had killed Wilson over a drug deal. Later, Crawford had told her that a Norwood resident and close friend of Wilson[] was the killer, and that the killer had attended Wilson's funeral wearing the shirt with Wilson's photograph and memorial dog tags. Crawford also had told Steger that he had told police that he was not involved, and that he had offered a false alibi–he said he would have Tara (to whom he was not married at the time) lie and say that they were both at home. He also said that Tara was having difficulty getting the story straight. Steger had asked Crawford if he knew how Wilson had been murdered–Crawford told her that Wilson had been shot twice: in the side of the face and in the back of the head.

After Steger had found out that Crawford was dating both her and Tara, Steger contacted Tara. The two women discussed the false alibi, and Steger expressed concern over Tara lying. After that, Crawford began to make harassing and threatening phone calls to Steger. Steger eventually spoke with the police because her friend, who had been Wilson's girlfriend at the time he was murdered, convinced her to contact the detective investigating the murder.

During Steger's cross-examination, Crawford's attorney questioned her about whether Wilson had a reputation for being violent. Although Steger had testified in her deposition that Wilson was a "pretty violent guy," at trial she said that he was only verbally violent with his girlfriend.

## II. State's Other Witnesses

Mike Lenhoff was a firearms expert. He testified that the Glock recovered from Crawford's landlord was not definitively the same gun used to murder Wilson, but that the markings were not inconsistent.

Patrick Moran was a police officer who testified about the blood spatter and bullets in the Mercedes. Although Moran had been a criminologist for seven years, had attended a 40-hour blood-spatter course, and had testified about crime scenes and blood spatter on many occasions over the preceding seven years, he had not been specifically identified as an expert witness. Moran's testimony established that Wilson had been shot in the car while he was seated in the front passenger seat. Crawford's attorney did not cross-examine Moran.

Thomas Briscoe had been incarcerated with Crawford. Briscoe had contacted police about 15 to 20 conversations that he had with Crawford in jail about Wilson's murder. He testified that Crawford had told him that Wilson had owed Crawford's relatives money and had repeatedly said, "I'm a killer. I'm not soft."

He said that Crawford had told him that he planned to have family members in the courtroom to intimidate the witnesses and to have his wife lie to the jury. Crawford had told Briscoe that he was very worried that Luken's testimony could hurt him. Crawford also indicated that if he was "going down, everybody is going down," and he asked Briscoe if he could "reach out and touch" the witnesses.

Briscoe testified that Crawford had told him that he was not concerned about the gun because he had ensured that the ballistics would not match up by twisting a metal object into the barrel of the gun. Briscoe also testified that Crawford said that he would blame the crime on Russians or Africans and that no jury would find him guilty because he was white, clean-cut, and in the military.

Dr. Robert Pfalzgraf performed Wilson's autopsy. He testified at trial that defensive wounds generally occurred on the hands or arms when a person attempted to block a blow or a gunshot. He found that Wilson had a set of injuries on his hands that were consistent with defensive wounds. Wilson's right hand showed evidence of blunt-impact trauma close to the time of death. Furthermore, stippling (where the skin is "burned" from gunpowder) appeared on Wilson's face, but not on a large part of his forehead, which was consistent with a hand covering the face.

The state's final witness was Detective John Horn. He testified that he had interviewed Crawford shortly after the murder because investigators knew that Crawford had been with Wilson on the night of the murder. In October 2004, Horn interviewed Crawford. During that interview, Crawford claimed that he had approached Wilson to buy marijuana, that they had driven to Hamilton, Ohio, and then to Elmwood, Ohio, and that Wilson had dropped him off at home between 11:15 and 11:30 p.m. Crawford was not considered a suspect at that time.

After Giles had spoken with Horn, Horn asked Crawford to give fingerprints. He did not tell Crawford about Giles's statement, and he did not indicate to Crawford that he was a suspect. Yet Crawford appeared nervous during this visit–he told Horn that he had heard that he was a suspect.

After giving statements to Horn, the various witnesses (Giles, Luken, and Wittekind) had told him that they would not testify against Crawford. The only witness who had agreed to cooperate was Steger. Horn had no further contact with Crawford until 2006.

Crawford was a witness in another crime in September 2006. Horn spoke to Crawford again at that time. Horn told Crawford that police had recovered the Glock, that it was traceable to Crawford, and that there were individuals who had told him that Crawford had murdered Wilson. Crawford told Horn that he was going into the military–Horn replied that it would not absolve him of his sins. Crawford responded that his mother had told him the same thing. Shortly after

this conversation, Crawford's case was presented to a grand jury. Crawford was arrested on December 25.

The trial court allowed the state to play tapes of phone calls that Crawford had made while he was in jail. Much of the taped conversations involved Crawford telling Tara or others that he was horribly upset about the situation, that he was sorry that Wilson had died, and that he had killed Wilson in self-defense. In other parts of the tapes, Crawford worried about possible witnesses against him and told a friend that the tampering-with-evidence charge could not stick.

The trial court redacted references to a plea agreement that Crawford had first accepted and then rejected. But some vague references to the agreement were left intact: "I will do 15, I will do 14 years standing on my head." "I will ask for early release * * * I'm gonna be in prison for 10 years." "Brian would've been the most hurtful witness I had. Right? And if you're telling me, Brian * * * you're gonna say, 'Hey look I've gotta say this and this,' I'd have been like, OK, I'm done for, thank you. * * * And maybe I'd have walked out of there with less than 10 years if I'd known this months ago."

During his cross-examination, Horn testified that, besides clothing and jewelry, nothing had been found with Wilson's body other than an identification and one penny. No gun was found at the scene.

### III. Crawford's Witnesses

Josh Meadors testified that he knew both Crawford and Wilson, and that he had never known of a problem between them. Meadors testified that Wilson crash[ed] Crawford's motorcycle and guessed that Wilson had paid Crawford about $1,000 for it.

Darryl Love was incarcerated with Crawford and Briscoe. He testified that Briscoe had told him that he wanted to "jump on a case," and that Briscoe had asked Love whether he thought it would be more beneficial to testify against a white defendant or a black defendant. Love also testified that he and Crawford had a falling out just before Love was moved to another location, but that he wanted to testify for Crawford because he thought Briscoe was lying. (During cross-examination, Love admitted that Briscoe had not told him that he planned to lie during the trial.)

Jason Crawford was David Crawford's cousin. Jason was a good friend of Wilson–they had gone on vacations together, and Jason had sold Wilson a car. He generally had spoken to both Crawford and Wilson on a daily basis and did not know of any problems between the two. He testified that Crawford was not angry that Wilson had crashed his motorcycle because Wilson had paid Crawford for it. He also testified that Wilson was a drug dealer.

Crawford testified in his own defense.  He said that he had never had an altercation with Wilson prior to the night of Wilson's death.  He testified that, about a week before the murder, Wilson had called him to tell him that he had been shot at and robbed of cocaine and money.  Wilson asked Crawford to help him find the robber and "do something to him."  They drove back to the area where the robbery had taken place, and according to Crawford, Wilson had pulled a gun on someone and "flipped out."

Crawford testified that, on the night of the murder, Wilson had wanted to purchase cocaine from him.  Wilson picked him up, and the two of them drove to Hamilton to purchase marijuana for Wilson to sell, and they then stopped at a house in Elmwood.  Next, they went to Crawford's house to pick up the cocaine–Crawford got the cocaine and went back to the car.  At this point, Crawford said, Wilson had asked him to drive so that Wilson could examine the cocaine.

Crawford testified that he had told Wilson that he wanted $5,500 for the cocaine, and that Wilson had thought that Crawford was "ripping him off."  Crawford said that Wilson told him that he was taking the cocaine anyway.  Crawford threatened to tell his cousin Jason that Wilson had wanted to rob him.  Crawford told Wilson that Jason would take his car and cut him off from his supply of drugs.  Crawford said that Wilson had pulled out a gun on him and replied, "Not if I leave you stinking."

Crawford said that he was driving the car when Wilson had pulled the gun out and that Wilson had directed him where to drive.  Wilson told him to pull over on a dark street, and as he was pulling over, he pulled out his own gun and shot Wilson twice.  Crawford said that he believed that if he had not shot Wilson, Wilson would have shot him and left him on the street.  Crawford said that he had laid Wilson on the street and then driven to Luken's house.  He said that Luken had put on gloves and picked the shell casings out of the car.  He also said that he had given both his own gun and Wilson's gun to Luken.

Crawford told the jury during his direct testimony that he had previously pleaded guilty to manslaughter and tampering with evidence, but had withdrawn that plea.

After Crawford had withdrawn his guilty plea, he entered a notice of alibi, but later withdrew it.  The state questioned Crawford about this on cross-examination.

(Doc. 9, Ex. 22, pp. 2-10).

The case was tried to a jury, which found petitioner guilty as charged.  (*See* Doc. 9, Ex.

17).  On November 9, 2007, the trial court sentenced petitioner to an aggregate prison term of

twenty-eight (28) years to life.[3]  (Doc. 9, Ex. 18).

## Direct Appeal Proceedings

With the assistance of new counsel for appeal purposes, petitioner timely appealed to the

Ohio Court of Appeals, First Appellate District, raising the following assignments of error:

1.  The trial court erred to the prejudice of the Defendant-Appellant by not granting the Rule 29 motion as there was insufficient evidence to convict.

2.  The trial court erred to the prejudice of Defendant-Appellant because the verdict was against the manifest weight of the evidence.

3.  Trial court erred when it failed to order a mistrial after jurors saw the defendant in handcuffs.

4.  The court err[]ed in overruling objections and allowing unfairly prejudicial evidence of jail tapes, a gun, and an alibi that was withdrawn before trial.

5.  The defendant received ineffective assistance of trial counsel when counsel failed to cross examine key witnesses.

6.  The court erred when it over-ruled defense objections and found Officer Moran an expert on blood spatter without a *Daubert* hearing or allowing defense to voir dire the witness.

7.  The Defendant-Appellant[']s right to a fair trial was compromised by cumulative error.

8.  The defendant was given an unlawful sentence under *State v. Foster*[, 845 N.E.2d 470 (Ohio 2006)].

(Doc. 9, Exs. 19-20).

On November 7, 2008, the appellate court issued a Decision and Judgment Entry

overruling the assignments of error and affirming the trial court's judgment.  (Doc. 9, Ex. 22).

---

[3]Specifically, petitioner was sentenced to the following terms of imprisonment: twenty (20) years to life for the aggravated murder offense, to be served consecutively to a 3-year prison term on one of the attached firearm specifications; fifteen (15) years to life for the murder offense, as well as a 3-year prison term on one of the attached firearm specifications, to be served concurrently with the sentences imposed on the aggravated murder charge; and a consecutive prison term of five (5) years for tampering with evidence.  (Doc. 9, Ex. 18).

Next, on January 20, 2009, petitioner filed a *pro se* notice of appeal and motion for leave to file a delayed appeal to the Ohio Supreme Court, which was granted.  (*See* Doc. 9, Exs. 23-25).  In his memorandum in support of jurisdiction, petitioner asserted essentially the same claims of error that had been raised on appeal to the Ohio Court of Appeals.  (Doc. 9, Ex. 26).  On July 1, 2009, the Ohio Supreme Court denied petitioner leave to appeal and summarily dismissed the appeal "as not involving any substantial constitutional question."  (Doc. 9, Ex. 27).

### Application To Reopen Appeal

On January 22, 2009, while his appeal from the November 7, 2008 direct appeal decision was pending before the Ohio Supreme Court, petitioner filed with the assistance of counsel from the Ohio Public Defender's Office a timely application with the Ohio Court of Appeals, First Appellate District, requesting that his appeal be reopened.  In the application filed pursuant to Ohio R. App. P. 26(B), petitioner alleged that his appellate counsel was ineffective for failing to raise the following claims as assignments of error:

> 1.  The trial court committed reversible error when it failed to merge the offenses of aggravated murder and murder; entered convictions on both counts; and sentenced Mr. Crawford on both counts, when the alleged offenses were allied offenses of similar import committed with a single animus on a single victim. . . .
>
> 2.  Mr. Crawford was provided ineffective assistance of counsel when trial counsel failed to object to the trial court's failure to merge the offenses of aggravated murder and murder; failed to object to the trial court's entry of convictions on both counts; and failed to object to the trial court's sentencing of Mr. Crawford on both counts, when the alleged offenses were allied offenses of similar import committed with a single animus on a single victim. . . .

(Doc. 9, Ex. 28).

The Ohio Court of Appeals granted petitioner's application to reopen the appeal, and on November 4, 2009, issued a Judgment Entry sustaining the first assignment of error, reversing "the trial court's judgment imposing separate sentences for aggravated murder and murder," and

remanding the case "for resentencing."  (Doc. 9, Exs. 30, 33).

### Resentencing

Petitioner was resentenced on January 19, 2010 in accordance with the Ohio Court of Appeals' Judgment Entry in the reopened appeal.  Specifically, on resentencing, Counts One and Two were merged as allied offenses of similar import. (Doc. 9, Ex. 34).  However, because the trial court had previously ordered the two sets of sentences to be served concurrently, the aggregate sentence of twenty-eight (28) years to life remained the same.  (*See* Doc. 9, Exs. 18, 34).  Apparently, petitioner did not pursue an appeal in the state courts from the January 19, 2010 resentencing entry.  (*See* Doc. 9, Brief, p. 16).

### Federal Habeas Corpus

Petitioner filed the instant federal habeas corpus action in August 2010.  (*See* Doc. 1).  He alleges the following grounds for relief:

**Ground One:**  Crawford's convictions should be overturned as against the weight and sufficiency of the evidence.  The state did not meet its burden.  On count one, aggravated murder R.C. 2903.01, the state failed to prove the pre-planning element.  The state's witness testified that Crawford told them he shot Wilson in self-defense and that is what Crawford himself testified to.  No testimony or evidence showed a definite process of reasoning in advance of the homicide, and there was no evidence of a scheme designed to cause death.

**Ground Two:**  On count two, murder R.C. 2903.02, the state did not show Crawford caused the death of Wilson as a proximate result of attempting to commit felonious assault.  To find felonious assault, Crawford had to have knowingly caused serious physical harm.  There are no witnesses or testimony to show he acted knowingly beyond a reasonable doubt, and further, he acted in self-defense.  Also, the state failed to provide motive for such a crime, although they did suggest different ones.

**Ground Three:**  Several jurors on separate occasions saw Crawford in handcuffs, being led by a sheriff down the hallway.  The judge did not give curative instructions and simply asked if they could still be impartial while not instructing them on how to handle the sighting.

**Ground Four:**  The gun, despite solid scientific testing and evidence, could not be linked to the crime and was still allowed to be handled by the jury.  There was also substantial testimony about the gun that was heard by the jury.  Jailhouse conversations that strongly suggested that there was a withdrawal guilty plea were also heard by the jury.  Incidentally, they also violated the prohibition against pre-trial negotiations.  Finally, a notice of alibi filed by Crawford's attorney to protect filing deadlines that was withdrawn prior to trial was also admitted into evidence. This was used unfairly to impeach Crawford.

**Ground Five:**  Crawford received ineffective assistance of counsel because his trial counsel did not cross examine three police witness[es], in particular the "blood spatter expert" who presented highly damaging evidence against Crawford.  The prosecutor responded to her objections that the witness was not an expert with, "well she could have crossed him to show that but she chose not to" and her ineffective performance prejudiced Crawford's case.

**Ground Six:**  The court erred when it denied a motion for mistrial after it over-ruled defense objections and found officer Moran an expert on blood spatter without a *Daubert* hearing or allowing the defense to voir dire the witness.  The defense counsel specifically asked for a *Daubert* hearing and the court refused. Crawford should have been granted a mistrial as a result.

**Ground Seven:**  Crawford was prejudiced by the cumulative effect of errors and omissions:

> 1.  Defense counsel noted a continuing objection to the court not reviewing transcripts for inconsistencies for prior testimony.

> 2.  Defense counsel objected as the sheriff would not allow Crawford to change clothes and he had to wear the same outfit. The state continually pointed out what Crawford was wearing.

> 3.  The coroner's photographs were cumulative and gory.

> 4.  A firearm that was never proven to have anything to do with the crime was allowed to go to the jury simply for them to have a "murder weapon" to hold onto something and was therefore, highly prejudicial under Evid. R. 403.

> 5.  The state moved in jail tapes that were not authenticated and full of hearsay and intimated that Crawford had pleaded guilty prior to trial.

> 6.  The state moved in a copy of its own discovery.  The court allowed it even after admitting it usually didn't allow this sort of thing.

11

7.  One-third of the jury saw Crawford in handcuffs and did not receive curative instructions.

8.  CPD Perry was in the courtroom during opening statements in violation of the court[']s separation of witnesses, [and] he testified over objection from the defense.

9.  The prosecutor repeatedly asked Crawford if he pulled the trigger and made his hand into a gun and fired it at the defense counsel.

10.  Plus all the other assignments of error, *supra*.

**Ground Eight:** Crawford was sentenced consecutively on the aggravated murder and tampering with evidence charges.  Because Crawford had not previously been in prison or even convicted of a felony he was entitled to the minimum sentence within the range authorized by the statute.  He should be re-sentenced to concurrent, not consecutive time.

(Doc. 1, pp. 5-12).

## II.  OPINION

### A.  Petitioner Has Not Demonstrated He Is Entitled To Relief Based On The Claims In Grounds One And Two Challenging The Sufficiency And Weight Of The Evidence Supporting His Convictions On The Aggravated Murder And Murder Charges

In Grounds One and Two of the petition, petitioner claims he is entitled to habeas relief because the jury's verdicts of guilt on the aggravated murder and murder charges are not supported by the weight or sufficiency of the evidence.  (Doc. 1, pp. 5-6).  The claims were raised by petitioner on direct appeal to both the Ohio Court of Appeals and Ohio Supreme Court and, therefore, are not procedurally barred from federal habeas review.[4]

The Ohio Court of Appeals was the only state court to issue a reasoned decision

---

[4]Petitioner also argued on direct appeal to the Ohio Court of Appeals that the jury's verdict of guilt on the tampering-with-evidence charge was not supported by the weight or sufficiency of evidence.  (*See* Doc. 9, Ex. 20, pp. 6-8).  Petitioner did not assert such a claim on further appeal to the Ohio Supreme Court (see Doc. 9, Ex. 26, p. 4), nor has he raised the issue as a ground for relief in the instant habeas petition.  Therefore, the argument is deemed waived and will not be considered by the undersigned in addressing the claims alleged by petitioner in challenging the weight and sufficiency of evidence supporting his aggravated murder and murder convictions.

addressing the merits of the claims pertaining to the aggravated murder and murder charges.  The

state appellate court overruled the assignments of error, reasoning in relevant part as follows:

> To determine if a conviction is supported by sufficient evidence, this court views the evidence in a light most favorable to the prosecution and determines whether any rational jury could have found the essential elements of the offenses had been proved beyond a reasonable doubt.  When reviewing the manifest weight of the evidence, the court uses a different test.  We review the record, weigh the evidence, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created a manifest miscarriage of justice.

> In this case, the state met its burden to produce sufficient evidence for a conviction.  Further, the jury did not lose its way and create a manifest miscarriage of justice by finding Crawford guilty.

> For aggravated murder, the state was required to prove that Crawford had "purposely, and with prior calculation and design, cause[d] the death of" Wilson.

> There was no dispute that Crawford had caused the death of Wilson.  Crawford admitted that he had shot Wilson.  The coroner testified that Wilson had died as a result of one of the gunshots.

> The state presented enough evidence to prove that Crawford had killed Wilson purposely, and with prior calculation and design.  Several witnesses testified that Crawford had told them directly or hinted that he had planned to kill Wilson.  This was sufficient to show both that he had planned the murder and that he had purposely killed Wilson.  And the jury believed those witnesses rather than Crawford. . . .

> Crawford claimed that he had killed Wilson in self-defense.  While the state had the burden of proving beyond a reasonable doubt that Crawford had killed Wilson purposely, with prior calculation and design, self-defense is an affirmative defense, so the burden shifted to Crawford.  He had the burden of proving, by a preponderance of the evidence, that he (1) was not at fault in creating the situation; (2) genuinely believed that he was in imminent danger of death or bodily harm, and that the only way to avoid the danger was to shoot Wilson; and (3) did not violate a duty to retreat or avoid the danger.

> The jury did not believe Crawford's testimony that Wilson had pulled a gun on him and that he was forced to kill Wilson to save his own life.  And after reviewing the entire transcript of the trial, we cannot say that the jury lost its way.  Crawford had told various individuals that he had planned to kill Wilson.  Their combined testimony was more credible than Crawford's.  Moreover, no evidence ever surfaced that Wilson even had a gun on the night of the murder.  Wilson had

wounds on his hands that were consistent with defensive wounds.  The stippling on his hands and head suggested that he had put his hands to his face before he was shot–this was hardly an action that a man holding his own gun would have taken.  Crawford failed to prove that the murder was in self-defense by a preponderance of the evidence.

(Doc. 9, Ex. 22, pp. 10-12) (footnotes to state statutory and case citations omitted).

As a threshold matter, the Court must first determine the scope of review of the various claims for relief that have been asserted in Grounds One and Two of the petition.  In this federal habeas case, the Court has jurisdiction to review petitioner's claims only to the extent that petitioner challenges his confinement based on an alleged violation of the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law."  28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Wilson v. Corcoran,* __ U.S. __, 131 S.Ct. 13, 16 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions")).

First, because habeas review is limited to claims implicating federal concerns, the Court lacks jurisdiction to consider petitioner's claims to the extent he contends the jury's verdicts of guilt are against the manifest weight of the evidence.  Such claims are based on a state-law concept that is "both quantitatively and qualitatively different" from federal due process sufficiency-of-evidence principles.  *See Tibbs v. Florida*, 457 U.S. 31, 41-47 (1982); *State v. Thompkins,* 678 N.E.2d 541, 546-48 (Ohio 1997).[5]  Because the claims challenging the weight of the evidence thus raise issues of state-law only, they do not constitute cognizable grounds for relief subject to review in this federal habeas corpus proceeding.

_____

[5]It is noted that *Thompkins* was superseded on other grounds by state constitutional amendment allowing for state supreme court review of manifest-weight-of-the-evidence claims in death penalty cases.  *See State v. Smith,* 684 N.E.2d 668, 683-84 & n.4 (Ohio 1997).

14

Second, petitioner has not alleged a cognizable ground for federal habeas relief to the extent he contends in Grounds One and Two that he is entitled to relief because he presented sufficient evidence at trial to prove that he shot the victim in self defense. In Ohio, self defense is an affirmative defense, which the defendant has the burden of establishing by a preponderance of the evidence in accordance with standards set forth in Ohio Rev. Code § 2901.05. *See, e.g., State v. Goff,* 942 N.E.2d 1075, 1082 (Ohio 2010) (citing *State v. Thomas*, 673 N.E.2d 1339 (Ohio 1997)); *see also Caldwell v. Russell*, 181 F.3d 731, 739-40 (6th Cir. 1999). The Sixth Circuit has long held that the federal "due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime" as defined by the State. *Caldwell*, 181 F.3d at 740 (holding that the Ohio prisoner "did not effectively challenge the sufficiency of evidence in support of the essential state law elements of murder" by "only fault[ing] the jury's refusal to credit his proffered affirmative [self-defense] excuse or justification for th[e] purposeful killing"); *see also Booth v. Carlton,* No. 95-6448, 1997 WL 135495, at *2 (6th Cir. Mar. 24, 1997) (finding no merit to claim challenging the sufficiency of evidence based on proof that the petitioner had "acted in self-defense . . . because the due process guarantee . . . extends only to facts needed to establish the elements of the crime and not to the state's burden to prove the absence of an affirmative defense"); *Black v. Ohio,* No. 1:09cv171, 2010 WL 1257883, at *6 & n.5 (S.D. Ohio Feb. 2, 2010) (Black, M.J.) (Report & Recommendation) (and cases cited therein), *adopted*, 2010 WL 1257881 (S.D. Ohio Mar. 31, 2010) (Barrett, J.) (holding that the petitioner had not alleged a cognizable ground for relief to the extent he claimed that he had met his burden of proving that he had acted in self

15

defense); *cf. Richardson v. Warden, Lebanon Corr. Inst.*, 384 F. App'x 479, 481 (6th Cir. 2010) (involving affirmative defense of insanity).

Because, under Ohio law, the issue whether or not petitioner acted in self defense does not affect the determination of an element of the aggravated murder and murder offenses that were charged against petitioner, any contention by petitioner that the evidence was sufficient to establish that he acted in self defense does not give rise to a cognizable constitutional claim. *See, e.g.*, *Black, supra*, 2010 WL 1257883, at *6 (and cases cited therein). The Court's review, therefore, is limited solely to consideration of petitioner's claims challenging the sufficiency of evidence that was presented at trial to establish his guilt beyond a reasonable doubt on the aggravated murder and murder charges.

In this federal habeas case, the applicable standard of review governing the adjudication of the constitutional issues that were addressed on the merits by the Ohio Court of Appeals is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk*, __ F.3d __, No. 08-3247, 2011 WL 3524301, at *4 (6th

16

Cir. Aug. 12, 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)).  "A state court's

adjudication only results in an 'unreasonable application' of clearly established federal law when

'the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting

*Williams,* 529 U.S. at 413).

 The statutory standard, established when the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet.  *Id.*  As the

Sixth Circuit recently explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's
> standards.  *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179
> L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the
> record before the state court where a claim has been adjudicated on the merits by
> the state court).  It is not enough for us to determine that the state court's
> determination is *incorrect*; to grant the writ under this clause, we must hold that
> the state court's determination is *unreasonable*. . . .  This is a "substantially higher
> threshold.". . .  To warrant AEDPA deference, a state court's "decision on the
> merits" does not have to give any explanation for its results, *Harrington v.
> Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need
> to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the
> result of the state-court decision contradicts them."  *Early v. Packer,* 537 U.S. 3,
> 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).

 Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete

bar on federal court relitigation of claims already rejected in state proceedings" and "preserves

authority to issue the writ in cases where there is no possibility fairminded jurists could disagree

that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington*, 131 S.Ct.

at 786.  In other words, to obtain federal habeas relief under that provision, the state prisoner

must show that the state court ruling on the claim presented "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

In determining whether or not relief should be granted on a constitutional claim that was adjudicated by the state courts, the "federal habeas court reviewing the state-court judgment must apply the law that controlled 'at the time his state-court conviction became final.'" *Miller v. Stovall,* 608 F.3d 913, 919 (6th Cir. 2010) (quoting *Williams,* 529 U.S. at 390), *petition for cert. filed,* 79 U.S.L.W. 3404 (U.S. Dec. 21, 2010) (No. 10-851); *see also Otte, supra,* 2011 WL 3524301, at *4 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision").  Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte, supra,* 2011 WL 3524301, at *4 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010), *petition for cert. filed,* __ U.S.L.W. __ (U.S. Apr. 4, 2011) (No. 10-9911)).  The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

In the instant case, although the Ohio Court of Appeals cited only Ohio authorities, it correctly identified and applied the clearly-established standard of review enunciated by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307 (1979), in addressing the sufficiency of the evidence supporting petitioner's convictions.  The Due Process Clause requires the State to

prove beyond a reasonable doubt every fact necessary to constitute the charged offense.  *In Re Winship,* 397 U.S. 358, 363-64 (1970).  As the state appellate court recognized, when a petitioner raises a sufficiency-of-evidence claim in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson,* 443 U.S. at 319 (emphasis in original).

The State is not required under the Due Process Clause to rule out every hypothesis except that of guilt beyond a reasonable doubt.  *Id.* at 326.  Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir. 1983).  It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence.  *Jackson,* 443 U.S. at 319.  Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the jury which convicted the petitioner.  *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction."  *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)), *cert. denied,* 130 S.Ct. 1134 (2010).  Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime.  *Id.* at 796-97 (and Sixth Circuit cases cited therein).

In this case, petitioner was charged with and convicted of aggravated murder as defined in Ohio Rev. Code § 2903.01(A) and of murder as defined in Ohio Rev. Code § 2903.02(B), with firearm specifications. To establish the charged aggravated murder offense with firearm specification, the State was required to prove beyond a reasonable doubt that petitioner "purposely, and with prior calculation and design," caused the death of William Wilson, and that petitioner had "on or about his person, or under his control, a firearm while committing the offense . . . and displayed the firearm, brandished the firearm, indicated that he possessed a firearm or used it to facilitate the offense." (*See* Doc. 9, Ex. 1). To establish the charged murder offense with firearm specification, the State was required to prove beyond a reasonable doubt that petitioner caused the death of Wilson "as a proximate result of committing or attempting to commit" a felonious assault offense, and that petitioner had "on or about his person, or under his control, a firearm while committing the offense of Murder and displayed the firearm, brandished the firearm, indicated that he possessed a firearm or used it to facilitate the offense." (*See* Doc. 9, Ex. 1).

As the Ohio Court of Appeals pointed out in its decision overruling the claims of error, petitioner does not dispute and in fact admitted at trial that he pulled out a gun that was in his possession and shot Wilson twice at close range while petitioner was sitting in the driver's seat and Wilson was sitting in the front passenger seat of Wilson's Mercedes. (*See* Doc. 9, Trial Tr. 1524-25, 1633). Petitioner also does not dispute that Wilson died as a result of the gun shot wounds to his face and head. (*See* Doc. 9, Ex. 38, Tr. 441, 462-63). Nevertheless, petitioner claims that the evidence was insufficient to prove beyond a reasonable doubt that (1) he acted "purposely, and with prior calculation and design" to cause Wilson's death, for the purpose of establishing guilt on the aggravated murder charge; and (2) he "knowingly" committed or

attempted to commit a felonious assault offense against Wilson, which is an essential element of the murder charge.  (*See* Doc. 3, p. 6; Doc. 12, pp. 6-7).  Upon review of the trial transcript, the undersigned finds in accordance with the state court's decision that enough evidence was introduced from which a reasonable inference could be drawn that petitioner acted with the requisite criminal intent to establish his guilt beyond a reasonable doubt on both charges.

First, with respect to the aggravated murder count, the State was required to prove beyond a reasonable doubt that petitioner acted "purposely," or in other words, with the "specific intention to cause a certain result."  *See* Ohio Rev. Code § 2901.22(A).  In a homicide case such as this, the requisite intent to kill "need not be proven by direct testimony," but rather "may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound."  *State v. Stallings,* 731 N.E.2d 159, 171 (Ohio 2000) (quoting *State v. Robinson,* 118 N.E.2d 517, 518 (syllabus, ¶5) (Ohio 1954)); *see also State v. Eley*, 672 N.E.2d 640, 648 (Ohio 1996).  It is well-settled in Ohio that the specific intention to kill may be inferred from the fact that a firearm was used to commit the offense because a firearm is "an inherently dangerous instrumentality, the use of which is reasonably likely to produce death."  *State v. Widner*, 431 N.E.2d 1025, 1028 (Ohio 1982); *see also Eley*, 672 N.E.2d at 648 ("intentional use of an inherently dangerous weapon during the commission of a felony, resulting in death, is sufficient to establish the element of purposefulness").

In addition, under Ohio law, the "prior calculation and design" element of the aggravated murder offense is satisfied if shown that the accused killed "purposely *after devising a plan* or scheme to kill."  *Moreland v. Bradshaw*, 635 F. Supp.2d 680, 719 (S.D. Ohio 2009) (quoting *Taylor v. Mitchell*, 296 F. Supp.2d 784, 821 (N.D. Ohio 2003) (emphasis in original)).

21

"[I]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *State v. Cotton*, 381 N.E.2d 190, 193 (Ohio 1978).  However, "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified."  *Id.* at 192 (syllabus, ¶3); *see also State v. Robbins*, 388 N.E.2d 755, 757-58 (Ohio 1979).

Second, with respect to the murder charge, the State was required to prove beyond a reasonable doubt that petitioner committed or attempted to commit the underlying felonious assault offense, which resulted in Wilson's death.  Under Ohio law, a person is guilty of a felonious assault if he "knowingly" either (1) causes serious physical harm to another, or (2) causes or attempts to cause physical harm to another "by means of a deadly weapon."  Ohio Rev. Code § 2903.11(A).  A person acts "knowingly" when, regardless of purpose, "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature."  Ohio Rev. Code § 2901.22(B).  In order to establish the specific offense of causing or attempting to cause physical harm to another "by means of a deadly weapon," the State must demonstrate that "the defendant knowingly engaged in some overt act directed toward executing or accomplishing the assault through the use of a deadly weapon."  *Nash v. Eberlin,* 258 F. App'x 761, 766 (6th Cir. 2007) (citing *State v. Kline,* 464 N.E.2d 159, 166 (Ohio Ct. App. 1983)).

Here, it is undisputed that petitioner used a deadly weapon, *i.e.*, a firearm,[6] which caused the death of the victim, and that petitioner fired two shots at close range into the victim's face or

---

[6]Ohio Rev. Code § 2923.11(A) defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." Ohio Rev. Code § 2923.11(B) expressly provides that firearms are a type of "deadly weapon."

head while sitting next to the victim in the victim's car.  Solely on the basis of these uncontested facts, a rational juror could have inferred that (1) petitioner "knowingly" committed a felonious assault offense, which caused Wilson's death, as charged in the murder count; and (2) petitioner acted "purposely" with the specific intent to kill Wilson, as charged in the aggravated murder count.  *Cf. Eley*, 672 N.E.2d at 648 (evidence and surrounding circumstances were found to "strongly support" the conclusion that the defendant intended to kill the victim, "since the shot allegedly intended for [the victim's] shoulder struck him in the upper part of his head").

Moreover, as the Ohio Court of Appeals found, evidence was presented at trial to support the reasonable inference that petitioner acted not only purposely, but with "prior calculation and design," when he shot and killed Wilson.  Specifically, DJ Wittekind testified that he witnessed a fight between petitioner and Wilson at a bar a month before Wilson was killed and that petitioner appeared upset after the confrontation, saying that he "would take care of it" and would "do him dirty;" after Wilson was killed, Wittekind overheard petitioner again say "[t]he exact same thing. He had done someone dirty."  (*See* Doc. 9, Trial Tr. 665-68, 674, 679-80, 701-02).  Brian Luken, petitioner's friend who was a reluctant witness for the State, testified that a couple of months before the shooting, he learned that petitioner and Wilson were involved in "some dispute" and that two weeks before the shooting, petitioner talked "about shooting [Wilson] or doing him harm."  (Doc. 9, Trial Tr. 910-14, 924-25).  Adam Giles also testified that during the month prior to Wilson's death, he became aware of "problems" between petitioner and Wilson stemming from "some kind of dispute between [petitioner's] cousin and [Wilson]," and that petitioner had "kind of hinted around that he wanted [to] kill" Wilson and even said, "I'm going to kill him." (Doc. 9, Trial Tr. 831-32).  In a second conversation prior to the shooting, petitioner made it known to Giles that he was going to use a gun to kill Wilson and asked Giles "if he could use my

driveway to put a car, if I had a cover to put a cover over and keep it there."  (Doc. 9, Trial Tr. 832-833).  As the Ohio Court of Appeals reasonably determined, a rational juror could infer from Luken's, Giles's and Wittekind's testimony that Wilson's shooting was not the result of an "instantaneous deliberation" on petitioner's part, but rather was based on a plan or scheme devised by petitioner in advance of the shooting.

Petitioner claims that he lacked the requisite intent to commit an aggravated murder or murder offense because he shot Wilson in self defense after Wilson pulled a gun on him and threatened to kill him.  (*See* Doc. 9, Trial Tr. 1522-26).  However, no evidence was presented at trial to support petitioner's self-serving version of events.  On the contrary, Adam Giles gave the following contradictory account, as reported by petitioner three weeks after the shooting:

> [Crawford] said he asked [Wilson] to look to his right, and when he did he pulled the gun out and shot him. [Wilson] wrestled with him, groaned and wrestled with him and when he did he pushed him forward and he shot him again.

(Doc. 9, Trial Tr. 846, 851).  Giles testified that petitioner never indicated that "he was in fear for his safety and that's why he shot" Wilson.  (Doc. 9, Trial Tr. 851-52).  Giles testified further that petitioner told him that after he shot Wilson, he drove for a while and then "[o]pened the door and "basically . . . threw [Wilson] out" of the car.  (Doc. 9, Trial Tr. 852).  Giles's testimony was corroborated by (1) Brian Luken, who testified that petitioner had stated that he shot Wilson "in the face" and "kicked him out of the car;" and (2) Sonia Steger, petitioner's ex-girlfriend, who testified that petitioner told her that Wilson was shot twice, first in the left "side of the face" and then, "when he slumped forward, . . . in the back of the head."  (Doc. 9, Trial Tr. 913, 921-22, 1137).

In addition, as the Ohio Court of Appeals pointed out, Wilson's firearm was not recovered from either the Mercedes or the scene where Wilson's body was discovered; indeed,

other than petitioner's own self-serving statements, no evidence was introduced to suggest that Wilson even had a gun in his possession with which to threaten petitioner on the night in question.  Moreover, most importantly, Dr. Robert Pfalzgraf, who performed Wilson's autopsy, testified that he observed "evidence of defensive wounds on" Wilson's body–specifically, "stippling" on Wilson's left hand, which was "the same as what's seen on his face;" Pfalzgraf stated the evidence of stippling found on both Wilson's hand and face indicated "his hand was in close proximity to the gunshot wounds," which was "consistent" with the theory that he was "attempting to block whatever was going to occur to him."  (Doc. 9, Ex. 38, Tr. 455-57).  As the Ohio Court of Appeals reasonably found (Doc. 9, Ex. 22, p. 12), such evidence is inconsistent with petitioner's claim that Wilson was the aggressor or had a gun in his hand aimed and ready to shoot at petitioner.

As the Supreme Court held in *Jackson*, deference must be given to the trier of fact in resolving conflicts in testimony in favor of the prosecution, in weighing the evidence, in determining the credibility of witnesses, and in drawing reasonable inferences from the evidence. *See Jackson,* 443 U.S. at 318-19, 326.  Based on all the evidence presented a trial, a rational juror could have rejected petitioner's version of events as lacking credibility and, instead, found that he acted with the requisite criminal intent when he fatally shot Wilson.  Therefore, the undersigned finds that sufficient evidence was presented to establish petitioner's guilt not only for aggravated murder, but also on the murder charge.

Accordingly, in sum, petitioner is not entitled to relief based on the claims alleged in Grounds One and Two of the petition challenging the sufficiency and weight of the evidence supporting his convictions for aggravated murder and murder.  To the extent petitioner contends the jury's verdicts of guilt are against the weight of the evidence, he raises issues of state-law

only which are not subject to federal habeas review.  Moreover, the Ohio Court of Appeals' adjudication of the constitutional, sufficiency-of-evidence claims alleged in Grounds One and Two involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the evidence presented at trial.

### B.  Petitioner Procedurally Defaulted And Has Waived The Claim In Ground Three, Which Was Reviewed For "Plain Error" On Direct Appeal In The State Courts

In Ground Three of the petition, petitioner alleges that the trial court erred in failing to give "curative instructions" to ensure that jurors who saw petitioner in handcuffs were not prejudicially affected by the sighting.  (Doc. 1, p. 7).  In the return of writ, respondent contends that petitioner procedurally defaulted and has waived the ground for relief.  Specifically, respondent argues that the claim is barred from review because petitioner did not object at trial to the trial court's method of handling the situation, and the state appellate courts relied on that state procedural bar in ruling that the error, as alleged on direct appeal,[7] did not amount to plain error.  (Doc. 9, Brief, pp. 25-31).  Respondent's argument has merit.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See*

---

[7]Petitioner raised a different claim on direct appeal to the Ohio Court of Appeals to the extent he contended that the trial court should have declared a mistrial when "[s]everal jurors on separate occasions saw [him] in handcuffs, being led by a sheriff down the hallway" of the courthouse.  (*See* Doc. 9, Ex. 20, p. 8).  Nevertheless, as discussed below, whether alleged as error stemming from the failure to give "curative instructions" or the failure to declare a mistrial, the ground for relief is procedurally barred from review in this federal habeas proceeding.

*O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir. 1985).  If the petitioner fails to fairly present his constitutional claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, he may have waived the claims for purposes of federal habeas review.  *See O'Sullivan,* 526 U.S. at 847-48; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th  Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

It is well-settled under the procedural default doctrine that the federal habeas court may be barred from considering an issue of federal law from a judgment of a state court if the judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision.  *See Harris,* 489 U.S. at 260-62.  The Supreme Court has stated:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Such a default may occur if the state prisoner fails to comply with a state procedural rule that required him to have done something to preserve the issue for appellate review.  *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996).

The Sixth Circuit applies a four-part test to determine if a claim is procedurally defaulted:

> (1) the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must determine whether the state courts actually enforced the state

procedural sanction; (3) it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

In the usual case, the adequate and independent state ground doctrine will not apply to bar consideration of a federal claim on habeas corpus review unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar. *Harris,* 489 U.S. at 263; *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).[8] In cases where the last state court to render a reasoned opinion explicitly relies on a procedural bar, the court will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim. *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).

In addition, the rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the state rule relied on by the courts is deemed "adequate" or, in other words, involves a "firmly established and regularly followed state practice" at the time that it was applied. *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991); *Richey v. Mitchell,* 395 F.3d 660, 679 (6th Cir.) (citing *White v. Schotten,* 201 F.3d 743, 751 (6th Cir. 2000)), *rev'd on other grounds,* 546 U.S. 74 (2005) (per curiam); *Warner v. United*

---

[8]In *Harris,* the Supreme Court noted that the rule requiring that the state court plainly state that its judgment rests on a state procedural default "applies only when a state court has been presented with the federal claim" raised by the state prisoner as a ground for federal habeas relief. *Harris,* 489 U.S. at 263 n.9; *see also Teague v. Lane,* 489 U.S. 288, 299 (1989) (plurality opinion) ("The rule announced in *Harris* . . . assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding."). The *Harris* Court further noted: "Of course, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Harris*, 489 U.S. at 263 n.9.

*States,* 975 F.2d 1207, 1213 (6th Cir. 1992); *see also Rideau v. Russell,* 342 F. App'x 998, 1002 (6th Cir. 2009).  To be considered regularly followed, a procedural rule need not be applied in every relevant case, but rather "[i]n the vast majority of cases."  *Dugger v. Adams,* 489 U.S. 401, 410 n.6 (1989); *see also Byrd v. Collins,* 209 F.3d 486, 521 (6th Cir. 2000).

Finally, the state court's adequate and independent finding of procedural default will preclude habeas corpus review of the petitioner's federal claims unless the petitioner can show "cause" for the default and "prejudice" as a result of the alleged violations of federal law, or that failure to consider the federal issues will result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750; *Harris,* 489 U.S. at 262; *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, as respondent has argued, petitioner committed a procedural default by failing to object at trial to the court's method of handling the jurors' sightings of petitioner in the hallway wearing handcuffs.  Ohio's contemporaneous objection rule is a firmly-established, adequate and independent state procedural rule, which serves to foreclose federal habeas review when relied on by the state courts as a basis for denying relief.  *See, e.g., Goodwin v. Johnson,* 632 F.3d 301, 315 (6th Cir. 2011) (citing *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001)); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *see also State v. Murphy*, 747 N.E.2d 765, 788 (Ohio 2001) (noting that Ohio's "waiver rule," which "requires that a party make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review," is "of long standing" and "goes to the heart of the adversary system of justice").  The Sixth Circuit has repeatedly held that "plain error" review by the state appellate court "constitutes enforcement of Ohio's contemporaneous objection rule."  *See Williams v. Bagley,*

380 F.3d 932, 968-69 (6th Cir. 2004) (and Sixth Circuit cases cited therein); *see also Goodwin*, 632 F.3d at 315.

The Ohio Court of Appeals clearly and expressly enforced the state procedural bar to review in rejecting the assignment of error that was asserted on direct appeal.  The court explicitly stated that because petitioner had "failed to object to how the trial court handled the situation," it could only review for "plain error."  (Doc. 9, Ex. 22, p. 13).  As such, the state appellate court's plain-error review did not constitute a waiver of state procedural default rules. *Seymour v. Weaver*, 224 F.3d 542, 557 (6th Cir. 2000); *see also Goodwin*, 632 F.3d at 315.  The Ohio Supreme Court's later unexplained entry denying petitioner leave to appeal and summarily dismissing the appeal "as not involving any substantial constitutional question" must be presumed to rely on the same state procedural ground.  *See Taqwiim v. Johnson,* No. 99-3425, 2000 WL 1234322, at **3 (6th Cir. Aug. 22, 2000) (citing *Levine v. Torvik,* 986 F.2d 1506, 1517 n.8 (6th Cir. 1993), and *Ylst,* 501 U.S. at 803-04).

Therefore, the claim alleged in Ground Three of the petition is barred from review in this proceeding unless petitioner can demonstrate cause for and prejudice from his procedural default or that a fundamental miscarriage of justice will occur if the ground for relief is not considered on the merits by this Court.  *See, e.g., Coleman,* 501 U.S. at 750; *Harris,* 489 U.S. at 262;

*Murray,* 477 U.S. at 485.

Petitioner has not demonstrated that failure to consider the claim will result in a "fundamental miscarriage of justice," or in other words, that the alleged error "probably resulted in the conviction of one who is actually innocent." *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995). Such a claim requires a showing of factual innocence, not mere legal insufficiency. *See House v. Bell,* 547 U.S. 518, 538 (2006); *Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006) (citing *Bousley v. United States,* 523 U.S. 614, 623 (1998)); *Wright v. Lazaroff,* 643 F. Supp.2d 971, 989 (S.D. Ohio 2009) (Barrett, J.; Hogan, M.J.); *see also Vanwinkle v. United States,* 645 F.3d 365, 369 (6th Cir. 2011). Petitioner has made no such showing in this case.

Petitioner also has not demonstrated "cause" for his procedural default in the trial court. Ineffective assistance of counsel may constitute cause excusing a default. *See, e.g., Murray,* 477 U.S. at 488; *Goodwin,* 632 F.3d at 315-16. However, in order to constitute "cause," the ineffective assistance of counsel claim itself must not be procedurally defaulted. *See, e.g., Edwards v. Carpenter,* 529 U.S. 446, 452 (2000); *Taylor v. McKee,* 649 F.3d 446, __, No. 09-1433, 2011 WL 3524297, at *3-4 (6th Cir. Aug. 12, 2011); *Landrum v. Mitchell,* 625 F.3d 905, 934 (6th Cir. 2010), *petition for cert. filed,* __ U.S.L.W. __ (U.S. Apr. 4, 2011) (No. 10-9911). Here, although petitioner alleged on direct appeal and in Ground Five that his trial counsel was ineffective for failing to cross-examine certain State witnesses (*see* Doc. 1, p. 9; Doc. 9, Ex. 20, pp. 10-11 & Ex. 26, pp. 4-5), he has never claimed that defense counsel was ineffective for failing to object to the trial court's method of dealing with the issue that arose on two occasions when certain jurors saw petitioner outside the courtroom being escorted in handcuffs by a

sheriff's deputy.[9]  Therefore, petitioner cannot rely on such an argument, which at this late juncture is itself procedurally defaulted, to overcome the procedural bar to review.

Accordingly, in sum, petitioner is not entitled to relief on the claim alleged in Ground Three, which he procedurally defaulted in the state courts.  Petitioner has not demonstrated either cause for his default or that a fundamental miscarriage of justice will occur if the claim is not considered on the merits by this Court.  Therefore, the claim alleged in Ground Three is barred from review in this federal habeas proceeding.  *Cf. Taylor, supra,* 2011 WL 3524297, at *2-3 (holding that (1) the district court had "correctly denied" a federal habeas petition because the petitioner's "shackling claim," reviewed for "plain error" by the state courts, was procedurally defaulted; and (2) petitioner's ineffective-assistance "cause" argument, which was itself procedurally defaulted in the state courts, could not be relied on to overcome the procedural bar to review).

### C.  Petitioner Is Not Entitled To Relief Based On The Claim Alleged In Ground Four Challenging The Admission Of Certain Evidence At Trial

In Ground Four of the petition, petitioner claims that the following items of evidence were improperly admitted against him at trial:  a firearm linked to petitioner, which the State suggested was the murder weapon; recorded "[j]ailhouse conversations" between petitioner and friends or family members that contained statements indicating petitioner had entered a plea agreement with the State, which he later withdrew; and evidence of a withdrawn notice of alibi filed by petitioner in the case.  (Doc. 1, p. 8).

---

[9]Specifically, on both occasions, the court privately and individually questioned the jurors who saw petitioner outside the courtroom to determine whether the sighting prejudicially affected their ability to reach a fair and impartial verdict.  During these discussions held outside the presence of the other members of the jury, the court instructed that sometimes those on trial on criminal charges are kept in custody because they "cannot make their bond," which does not mean they are "guilty of a charge;" the court also instructed these jurors that they were not to mention what they saw or discussed with the court to their "fellow jurors."  (*See* Doc. 9, Trial Tr. 1308-12, 1415-22).

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing petitioner's allegations of reversible error.  Relying on Ohio evidentiary rules and state case-law, the court overruled the assignment of error, reasoning in pertinent part as follows:

> Relevant evidence is any evidence that tends to make a material fact more or less probable.  All relevant evidence is admissible, unless it is inadmissible because of another rule or law.  But even relevant evidence is not admissible if the danger of unfair prejudice outweighs the probative value of the evidence.

> Concerning relevancy, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice."

> Crawford argues . . . that the trial court improperly admitted evidence of Crawford's jail tapes, the gun, and his withdrawn alibi.  We address each individually.

> Crawford contends that because the gun was not used in the murder, it was improperly admitted into evidence.  But the evidence strongly suggested that this gun was used to murder Wilson:  Crawford took it back from his landlord, practiced shooting the gun at a shooting range, and then after the murder gave it back to his landlord, telling him to get rid of it.  The trial court did not abuse its discretion by admitting the gun into evidence.  Furthermore, Crawford admitted that he had shot Wilson.  The admission of the gun, even if it was not the gun used in the murder, would not have materially prejudice[d] Crawford.

> The jailhouse tapes did not unfairly prejudice Crawford, nor did they violate the prohibition against revealing prior plea negotiations.  The probative value of the tapes far outweighed the danger of prejudice to Crawford.

> And the tapes would not have led the jury to assume that Crawford had entered into a plea agreement.  The only statement that might have led a juror to wonder if there were plea negotiations prior to trial was the following: "Brian would've been the most hurtful witness I had.  Right?  And if you're telling me, Brian * * * you're gonna say 'Hey look I've gotta say this and this,' I'd have been like, OK, I'm done for, thank you. * * * And maybe I'd have walked out of there with less than 10 years if I'd have known this months ago."  Although this statement may have led a juror to wonder about a plea agreement, we cannot say that the trial court abused its discretion in admitting the statement.  If it was an error to admit this statement, it was harmless error.  There was a plethora of other evidence that convinced the jurors that Crawford had planned and carried out Wilson's murder, without having acted in self-defense.  (We note that Crawford, in his direct testimony, told the jury that he had previously reached a plea agreement.)

> Many of the statements Crawford made on the tapes were actually exculpatory–Crawford repeatedly told the person with whom he was speaking that he had killed Wilson in self-defense and that he was in anguish because of it.
>
> Finally, Crawford argues that the court erred by allowing in evidence that Crawford had previously entered a notice of alibi. This evidence was relevant–it tended to show that Crawford was dishonest. And specific instances of conduct may be used to attack a witness's character for truthfulness on cross-examination.
>
> The trial court did not abuse its discretion by admitting evidence of the gun, the jailhouse tapes, and the alibi.

(Doc. 9, Ex. 22, pp. 14-15) (footnotes to Ohio evidentiary rules and case citations omitted).

In the instant case, the Court is precluded from considering petitioner's claim to the extent petitioner contends that the trial court abused its discretion under Ohio's evidentiary rules and case law interpreting those rules when it allowed the contested items to be admitted into evidence. The federal habeas court has jurisdiction to review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States. *See* 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Wilson v. Corcoran,* __ U.S. __, 131 S.Ct. 13, 16 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"). "Habeas review does not encompass state court[] rulings on the admission of evidence unless there is a constitutional violation." *Clark v. O'Dea,* 257 F.3d 498, 502 (6th Cir. 2001) (quoting *Clemmons v. Sowders,* 34 F.3d 352, 357 (6th Cir. 1994)). Therefore, to the extent petitioner's arguments for relief are based solely on a violation of Ohio's evidentiary rules or other error under Ohio law, he does not present a cognizable federal constitutional claim subject to review in this proceeding. *See, e.g., Pudelski v. Wilson,* 576 F.3d 595, 612 (6th Cir. 2009) (holding that to the extent the petitioner alleged the trial court violated Ohio R. Evid. 703 in admitting a coroner's expert testimony, his claim involved "an issue of state law that is not

34

subject to habeas review"), *cert. denied*, 130 S.Ct. 3274 (2010); *Bey v. Bagley,* 500 F.3d 514, 519 (6th Cir. 2007) (and Sixth Circuit cases cited therein) ("a claim that the state trial court erred in the application of state law, specifically a ruling on evidence, . . . standing alone, . . . is simply not cognizable on habeas review'); *see also Hall v. Vasbinder,* 563 F.3d 222, 239 (6th Cir. 2009) (same).

This Court does have jurisdiction to consider petitioner's claim to the extent he alleges that the trial court's evidentiary rulings deprived him of his due process right to a fundamentally fair trial.  *See Sandoval v. Toledo Corr. Inst.,* 409 F. App'x 847, 850 (6th Cir. 2010) (citing *Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010), *cert. denied,* 131 S.Ct. 2873 (2011)), *cert. denied*, 131 S.Ct. 2887 (2011); *see also Bey,* 500 F.3d at 519-20 (holding that the petitioner had asserted a cognizable habeas claim to the extent he alleged that "the admission of 'other acts' evidence [upheld by the Ohio Supreme Court] as a matter of state evidentiary law . . . rendered his entire trial fundamentally unfair").

In this case, as in *Bey*, the Ohio appellate court upheld the trial court's evidentiary rulings as a matter of state law.  As the Sixth Circuit noted in *Bey,* the Ohio court's decision that admission of the challenged "evidence was proper–combined with our ordinary inability to reconsider a state court's state-law-based decisions–would appear to defeat [petitioner's] claim." *See Bey,* 500 F.3d at 520.  In *Bey*, the Sixth Circuit stated that only "two possibilities" were open to petitioner for prevailing on the argument that "regardless of its compliance with state law, the state action may nonetheless violate due process, and thus be contrary to Supreme Court precedent"– either (1) "the state law (rule) itself contradicts Supreme Court precedent," or (2) "the state's application of the law (rule) under the particular circumstances does."  *Id.* at 521.

Here, as in *Bey*, petitioner does not challenge the constitutionality of the state evidentiary

35

rules or standards relied on by the Ohio Court of Appeals in upholding the trial court's decision to admit the three contested items into evidence.  Instead, his argument must be that, despite the Ohio appellate court's finding of compliance with state law, "the evidence admitted in this case was so *unfairly prejudicial* that it offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, . . . i.e., the fundamental right to a fair trial."  *Cf. id.* at 521 (internal citation and quotation omitted) (emphasis in original).

It is well-settled under Supreme Court precedents that "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  *Dowling v. United States,* 493 U.S. 342, 352 (1990).  The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Id.*; *see also Sanborn v. Parker,* 629 F.3d 554, 576 (6th Cir. 2010), *petition for cert. filed,* __ U.S.L.W. __ (U.S. July 15, 2011) (Nos. 10A1075, 11-5328); *Bey,* 500 F.3d at 522-23; *Sandoval,* 409 F. App'x at 850.  The inquiry in determining "[w]hether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in a sense of a crucial, critical highly significant factor."  *Brown v. O'Dea,* 227 F.3d 642, 645 (6th Cir. 2000) (quoting *Leverett v. Spears,* 877 F.2d 921, 925 (11th Cir. 1989) (internal citations and quotations omitted)); *see also Hudson v. Lafler,* 421 F. App'x 619, 627-28 (6th Cir. 2011), *petition for cert. filed,* __ U.S.L.W. __ (U.S. Sept. 2, 2011) (No. 11-6373).  The Supreme Court also has suggested that due process concerns may be triggered in cases where erroneously admitted evidence "is almost entirely unreliable and . . . the factfinder and the adversary system [would] not be competent to uncover, recognize, and take due account of its shortcomings."  *See Barefoot v. Estelle,* 463 U.S. 880, 899 (1983); *Whitley v. Wolfenbarger,* No. 2:08-cv-14172, 2010 WL 6184870, at *5 (E.D. Mich. Aug. 12, 2010) (Report & Recommendation), *adopted,* 2011 WL 927013 (E.D. Mich. Mar. 16, 2011).

36

To obtain relief based on a claim challenging the admission of evidence at a state criminal trial, the federal habeas petitioner must satisfy "stringent" standards. *Loza v. Mitchell*, 705 F. Supp.2d 773, 885 (S.D. Ohio 2010); *see also Hudson*, 421 F. App'x at 627 (citing *Schoenberger v. Russell*, 290 F.3d 831, 836 (6th Cir. 2002)) ("Erroneously admitting evidence under state evidence rules amounts to a due process violation in a federal habeas proceeding only in extraordinary cases."). The petitioner must establish both (1) that the challenged evidentiary ruling "violated a bedrock principle of justice sufficient to deprive [him] of a fundamentally fair trial" under the Fourteenth Amendment's Due Process Clause; and (2) that "the state courts' decision finding no error in the state court evidentiary ruling contravened or unreasonably applied clearly established Supreme Court precedent" under the standard of review set forth in 28 U.S.C. § 2254(d). *Loza,* 705 F. Supp.2d at 885; *cf. Schoenberger*, 290 F.3d at 836 (rejecting claim challenging the admission of evidence pertaining to the petitioner's prior "bad acts" given "the stringent standards of AEDPA and our general reluctance to second-guess state court evidentiary rulings in a habeas proceeding").

Moreover, even assuming error of constitutional dimension occurred, federal habeas relief may not be granted unless the error "had a substantial and injurious effect or influence in determining the jury's verdict." *See Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)); *see also Ford v. Curtis,* 277 F.3d 806, 809-11 (6th Cir. 2002) (involving claims challenging the admission of hearsay and "bad acts" evidence); *Peterson v. Warren,* 311 F. App'x 798, 804 (6th Cir. 2009) (involving evidence admitted in violation of the Confrontation Clause). In determining the effect of the error under *Brecht*, the federal habeas court must "consider both the impact of the improperly admitted evidence and the overall weight of the evidence presented at trial." *Peterson,* 311 F. App'x at 805.

37

Here, petitioner has not presented any Supreme Court or other relevant federal authority supporting the position that the admission of the challenged evidence was constitutionally impermissible; nor has he demonstrated that the circumstances of his case fall within the narrow category of infractions that trigger due process concerns.

First, contrary to petitioner's contention, the Ohio Court of Appeals reasonably determined that the firearm introduced into evidence was relevant and admissible in light of testimony indicating that it was the weapon likely used by petitioner to kill Wilson.  (*See* Doc. 9, Trial Tr. 637-43, 651-53, 670-76, 696-98, 898-99, 970-1009).[10]  In any event, because petitioner admitted that he shot and killed Wilson, the firearm was not "material in the sense of a crucial, critical highly significant factor."  *See Brown,* 227 F.3d at 645; *cf. Barefoot,* 463 U.S. at 899.  As the state appellate court found, any error in admitting the item into evidence was harmless. Petitioner has never claimed that the jurors would have discovered any additional damaging information not disclosed at trial upon closer examination of the weapon during their deliberations; moreover, because no issue was presented to be decided by the jury regarding the weapon that was used or petitioner's connection to it, it is highly unlikely that the firearm had any effect or influence on the jury in reaching its verdicts.  *See Calderon,* 525 U.S. at 45.

Second, it was reasonable for the Ohio Court of Appeals to conclude that the recorded jailhouse conversations, which were reviewed by the court prior to trial and redacted to eliminate references to earlier plea negotiations and the withdrawn plea agreement between petitioner and the State, neither "unfairly prejudiced" petitioner nor violated "the prohibition against revealing

---

[10]The undersigned finds particularly persuasive Adam Giles's testimony regarding a conversation he had with petitioner after Wilson was killed.  Giles testified that in that conversation, he asked petitioner what he had done with the gun he used to shoot Wilson; petitioner replied that he had sold it to his landlord.  (Doc. 9, Trial Tr. 898-99).

prior plea negotiations." (*See* Doc. 9, Ex. 22, p. 14 & Trial Tr. 1092, 1620-28). It is arguable that, as the state appellate court found, petitioner's vague unredacted statement about "maybe . . . walking out of there with less than 10 years if I'd have known this months ago" may have caused jurors to speculate about the possibility of prior plea negotiations. However, the details of the negotiations and withdrawn agreement did not come out until petitioner's direct examination during the presentation of the defense's case. (*See* Doc. 9, Trial Tr. 1581-89). Apparently, the testimony was elicited to show that petitioner initially was confused about the elements of manslaughter and self-defense. In any event, it is highly unlikely that the contested evidence pertaining to the withdrawn plea agreement substantially and injuriously affected or influenced the jury in deciding petitioner's guilt or innocence on the criminal charges. The trial court emphasized to the jury before it retired to deliberate that petitioner's "plea of not guilty is a denial of the charge and puts in issue all the essential elements of the crime," which the State was required to prove beyond a reasonable doubt. (Doc. 9, Trial Tr. 1949-50). Moreover, as discussed above in addressing the sufficiency of evidence, overwhelming evidence was presented not only to establish petitioner's guilt on all charges, but also to undermine petitioner's own self-serving version of events. Therefore, any error in admitting the recorded conversations was harmless.

Finally, the Ohio Court of Appeals found the evidence pertaining to petitioner's withdrawn alibi, which was introduced by the State during petitioner's cross-examination, was relevant to impeach petitioner's credibility. (Doc. 9, Ex. 22, p. 15). As in *Bey*, petitioner has offered nothing more than his disagreement with the state appellate court's conclusion that there was no abuse of discretion under Ohio's rules of evidence in allowing the evidence for impeachment purposes; petitioner's "personal disagreement is not cognizable on federal habeas

39

review, as it involves no constitutional dimension." *Cf. Bey,* 500 F.3d at 523.  In any event, the undersigned is convinced that any error in allowing the State to cross-examine petitioner about the withdrawn alibi defense did not have a substantial and injurious effect or influence on the jury's verdicts.  Much more damaging to petitioner's credibility was his own changing or contradictory accounts of the events that occurred on the night in question, as relayed to his friends and to police detective John Horn; the evidence of "defensive wounds" incurred by Wilson during the shooting incident; and the lack of any evidence, other than petitioner's own self-serving statements, to establish that Wilson was brandishing or even carrying a firearm when he was killed.  *Cf. Peterson*, 311 F. App'x at 805.

Accordingly, in sum, to the extent that petitioner seeks relief solely on the basis of a violation of Ohio's evidentiary rules or other error under Ohio law, he does not present a cognizable federal constitutional claim subject to review in this proceeding.  To the extent petitioner claims that he was denied a fair trial as a result of the trial court's challenged evidentiary rulings, the Ohio appellate court's determination that no reversible error occurred is neither contrary to nor an unreasonable application of clearly-established federal law as determined by the Supreme Court.  Because the trial court's alleged errors under Ohio law did not deprive petitioner of a fundamentally fair trial, the Court is bound by the state courts' adjudication of the state-law issue.  *Cf. Arrambide v. Hudson*, No. 1:08cv0065, 2010 WL 3463501, at *8 (N.D. Ohio July 23, 2010) (Report & Recommendation), *adopted*, 2010 WL 3463496 (N.D. Ohio Aug. 31, 2010).  In any event, given the overall overwhelming evidence of guilt that was presented in this case, petitioner has not demonstrated that any of the alleged evidentiary errors had a substantial and injurious effect or influence on the jury verdicts.

**D. Petitioner Is Not Entitled To Relief Based On The Claim Alleged In Ground Five Challenging The Effectiveness Of Trial Counsel In Cross-Examining State Witnesses**

In Ground Five of the petition, petitioner claims that his trial attorneys were ineffective because they did not cross-examine three police officers, who were called as State witnesses. Petitioner emphasizes that one of these witnesses, Patrick Moran, testified as a "blood spatter expert" and presented particularly "damaging evidence" against him. (Doc. 1, p. 9). The claim, which was raised to the state courts on direct appeal, is subject to review on the merits.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the claim of constitutional error. Citing the Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984), the court overruled the assignment of error, reasoning as follows:

> Crawford alleges that his trial attorneys provided ineffective assistance of counsel. Not so. To reverse on this ground, Crawford would have to show both that his attorneys' performance was deficient, and that but the deficient performance, there was a reasonable probability that the jury would have found him not guilty. Crawford cannot get past the first part of this test. His attorneys were highly competent and made the most of the facts that they were forced to deal with.
>
> Crawford specifically points to his attorneys' failure to cross-examine Moran and two other police officers. The other two officers' testimony had no more effect on the outcome of the trial than did Moran's testimony–they only testified about how they had responded to the scene and collected evidence.
>
> A defendant cannot succeed on an ineffective-assistance-of-counsel claim over a disagreement about trial strategy. Crawford admitted at trial that he had shot Wilson. The only thing for the jury to decide was whether Crawford had shot Wilson in self-defense. The three police officers' testimony added nothing of significance to the case; cross-examining them would not have made a whit of difference to the outcome.

(Doc. 9, Ex. 22, p. 17) (footnote citations omitted).

The Ohio Court of Appeals correctly identified and reasonably applied the clearly-

established two-part standard of review enunciated by the Supreme Court in *Strickland* in addressing petitioner's allegations of ineffective assistance by his trial counsel.  Moreover, the appellate court's decision was based on a reasonable determination of the facts in light of the record evidence.  Indeed, upon review of the record, the Court agrees with the state court's determination.

As the state appellate court recognized, to establish a *Strickland* violation, petitioner must demonstrate both (1) his trial attorneys made such serious errors that they were not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) counsels' deficient performance prejudiced the defense.  *See Strickland*, 466 U.S. at 687.  Under the first prong of the *Strickland* test, it must be shown that counsels' representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case.  *Id.* at 688.  In determining whether or not counsels' performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance.  *Id.* at 689.  To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsels' errors, the outcome of the trial would have been different.  *See Strickland,* 466 U.S. at 694.  Petitioner has met his burden if he shows that the result of the trial would "reasonably likely have been different absent the errors."  *Id.* at 695.  The Court need not examine the question of whether counsels' performance was deficient before addressing the question of whether petitioner was prejudiced by the challenged conduct.  The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground.  *Id*. at 697.

In the instant case, petitioner's conclusory and unsupported allegations are insufficient to

establish, in accordance with the two-part standard adopted by the Supreme Court in *Strickland*, that his trial counsel acted unreasonably in failing to cross-examine the three police officers or that counsels' challenged conduct prejudiced the defense.

As the Ohio Court of Appeals pointed out in rejecting petitioner's claim, two of the State witnesses, police officers Robert Perry and Mike Drexelius, only testified about their respective roles in responding to the scenes where the victim's body and the victim's car were found, as well as their observations and the evidence they collected upon their arrival at those scenes. (*See* Doc. 9, Trial Tr. 607-26, 761-82). The third witness, Moran, testified about his examination of evidence discovered in the interior of Wilson's Mercedes, including a gunshot hole in the right rear door, blood spatters and drips, a 9-millimeter Ruger cartridge recovered from under the front passenger seat, and other miscellaneous items found in the vehicle. (Doc. 9, Trial Tr. 783-817). With respect to the blood spatter evidence, Moran opined only that there was "high velocity blood spatter . . . indicating a great deal of force such as a gunshot," and that it was his opinion that the blood came "from a person in the front right passenger seat." (Doc. 9, Trial Tr. 801-02).

Contrary to petitioner's contention, neither Moran nor the other two police officers presented "highly damaging" testimony that arguably should have been subjected to cross-examination. Petitioner admitted at trial that he shot and killed Wilson and that the shooting occurred in Wilson's Mercedes when petitioner was sitting in the driver's seat and Wilson was sitting in the front passenger seat. (*See* Doc. 9, Trial Tr. 1524-25, 1633). Petitioner also admitted that he left Wilson's body at the scene responded to by Officer Perry and eventually abandoned Wilson's vehicle at the scene responded to by Officer Drexelius. (*See* Doc. 9, Trial Tr. 1529-30, 1535-37). As the Ohio Court of Appeals found, the officers' testimony, which did not pertain to any issue in dispute, "added nothing of significance to the case." (Doc. 9, Ex. 22,

43

p. 17).  Therefore, it was reasonable for the state appellate court to conclude that counsels' failure to cross-examine the witnesses did not amount to unreasonable or "deficient" conduct under the first prong of the *Strickland* test.

In any event, petitioner has not cited or presented any exculpatory evidence that would have been elicited on the police officers' cross-examination.  He, therefore, has not shown under the second "prejudice" prong of the *Strickland* test that it is reasonably likely the outcome of the trial would have been different if Perry, Drexelius and Moran had been cross-examined at trial.

Accordingly, in sum, the undersigned concludes that the Ohio courts' adjudication of the ineffective assistance of counsel claim alleged in Ground Five of the petition constitutes a reasonable application of clearly-established federal law, as determined by the Supreme Court in *Strickland*.  Petitioner, therefore, is not entitled to relief based on that ground.

**E.  Petitioner Is Not Entitled To Relief On The Claim In Ground Six Challenging The Denial Of His Mistrial Motion For Allowing Expert Testimony Without A *Daubert* Hearing**

In Ground Six of the petition, petitioner asserts that he is entitled to relief because his motion for mistrial should have been granted when Cincinnati police officer Patrick Moran was improperly allowed, over objection, to testify as an expert in analyzing the blood spatters found in Wilson's car; petitioner specifically contends that Moran's testimony was inadmissible in the absence of a hearing held in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or the provision of an opportunity for the defense to voir dire the witness. (Doc. 1, p. 10).

As an initial matter, as discussed above in addressing the evidentiary issues raised in Ground Four of the petition, "[e]rrors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas

corpus actions." *Adams v. Bradshaw*, 484 F. Supp.2d 753, 790 (N.D. Ohio 2007) (involving a claim stemming from the state court's failure to conduct a hearing in accordance with . . . *Daubert* . . ., or otherwise require a proper foundation of the methodology, qualifications and statistical analysis as to the State's DNA evidence"); *see also Wilson v. Corcoran,* __ U.S. __, 131 S.Ct. 13, 16 (2010); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *cf. Pudelski v. Wilson,* 576 F.3d 595, 612 (6th Cir. 2009).

In addition, petitioner's reliance on the Supreme Court's decision in *Daubert* is misplaced. *Daubert* concerned the admissibility of evidence under Fed. R. Evid. 702. The Sixth Circuit has held that the decision, which addressed an issue arising under the Federal Rules of Evidence, is "not relevant" in assessing the validity of a conviction obtained in a trial governed by state evidentiary rules. *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998); *see also Adams*, 484 F. Supp.2d at 790; *Anderson v. Jackson*, 567 F. Supp.2d 973, 983 (E.D. Mich. 2008); *cf. Wilson v. Sirmons,* 536 F.3d 1064, 1101-02 (10th Cir. 2008) (in an analogous habeas case, the Tenth Circuit stated: "Because *Daubert* does not set any specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether [the admission of such evidence] rendered the trial fundamentally unfair."); *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) (similarly recognizing on habeas review of a state conviction that *Daubert* does not "purport[] to set a constitutional floor on the admissibility of scientific evidence").

In the instant case, the Ohio Court of Appeals, as the last state court to issue a reasoned decision addressing the matter under standards set forth in Ohio R. Evid. 702, found no merit to petitioner's claim of reversible error. The court reasoned in pertinent part:

> Evid. R. 702 would have allowed Moran to testify as an expert if (a) his testimony related to subjects that lay people were not familiar with; (b) Moran was qualified as an expert by specialized knowledge, skill, experience, training, or education

about blood spatter; and (c) Moran's testimony was based on reliable scientific, technical, or other specialized information.

Blood-spatter patterns involve a subject that lay people are not knowledgeable about.  Moran had been a criminologist for seven years, had routinely examined and analyzed blood-spatter patterns, and had received both on-the-job and formal training.  His testimony was based upon specialized information.  The trial court did not err by allowing him to testify as an expert without a *Daubert* hearing.

Furthermore, even if it was erroneous to allow Moran to testify, it would not have constituted reversible error.  Moran's testimony only established that Wilson was shot while sitting in the front passenger seat.  Crawford admitted on direct examination that he had shot Wilson while he sat in the front passenger seat of the car.  Thus, Moran's testimony added nothing to affect the outcome of the case.

(Doc. 9, Ex. 22, pp. 16-17).

Upon review of the trial transcript, the undersigned agrees with the state appellate court's finding that Moran was qualified to testify about his observations and opinions regarding the blood spatters and drips he had examined.  Indeed, before the trial court would allow Moran to testify as an expert in that forensic area, the State was required to establish Moran's qualifications based on his employment for seven years as a criminologist, as well as his training in a 40-hour course and in his job in "dealing with blood spatter and blood pattern analysis." (*See* Doc. 9, Trial Tr. 794-99).  Petitioner has not cited or presented any evidence casting doubt on the reliability or validity of Moran's analysis of the blood spatters and drips found in Wilson's Mercedes.  Therefore, petitioner has not shown that the failure to provide a *Daubert* hearing or an opportunity for voir dire questioning of the witness rendered the trial fundamentally unfair or otherwise triggers constitutional concerns.

In any event, as the Ohio Court of Appeals also reasonably determined, any error in allowing Moran to testify as an expert without a *Daubert* hearing or voir dire questioning was harmless given that petitioner admitted on direct examination, as Moran had opined, that Wilson

46

was shot while sitting in the front passenger seat. It is highly unlikely that the alleged error regarding an undisputed matter had any effect on the jury in determining petitioner's guilt or innocence on the criminal charges. Therefore, in the absence of evidence in the record even remotely suggesting that the failure to hold a *Daubert* hearing or to provide an opportunity for voir dire questioning had a substantial and injurious effect or influence on the jury in reaching its verdicts, petitioner is not entitled to habeas relief based on his claim in Ground Six challenging the denial of his motion for mistrial. *See Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).

### F. The Claim Of Cumulative Error Alleged In Ground Seven Lacks Merit

In Ground Seven of the petition, petitioner contends he is entitled to relief based on the "cumulative effect" of the following errors or omissions that allegedly occurred during trial: (1) the court's failure to review transcripts of witnesses' prior testimony for inconsistencies; (2) the fact that petitioner was forced to wear the "same outfit" every day; (3) the admission of "cumulative and gory" photographs; (4) the admission of the firearm linked to petitioner; (5) the admission of the "jail tapes;" (6) the admission of the State's discovery response as an exhibit; (7) the jurors' sighting of petitioner in handcuffs; (8) a violation of the court's separation-of-witnesses order by a State witness, Cincinnati police officer Robert Perry, who was present in the courtroom during opening statements; (9) misconduct by the prosecutor in repeatedly asking petitioner "if he pulled the trigger" and in forming his hand "into a gun and fir[ing] it at the defense counsel;" and (10) all other errors alleged as grounds for relief in the petition. (Doc. 1, p. 11).

On direct appeal, the Ohio Court of Appeals summarily rejected petitioner's claim of cumulative error as follows:

> We have reviewed every word of the transcript of the trial. Crawford received a
> fair trial. None of these incidents individually or cumulatively are enough to
> order a reversal.

(Doc. 9, Ex. 22, p. 18).

The Sixth Circuit has held that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Cross v. Stovall,* 238 F. App'x 32, 41 (6th Cir. 2007) (quoting *Williams v. Anderson,* 460 F.3d 789, 816 (6th Cir. 2006)); *see also Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005) (and cases cited therein); *Solether v. Williams,* No. 3:10cv346, 2011 WL 2174992, at *5 (N.D. Ohio June 3, 2011); *Teagarden v. Warden, Madison Corr. Inst.*, No. 2:10cv495, 2011 WL 1659372, at *18 (S.D. Ohio May 3, 2011) (Report & Recommendation)(and cases cited therein), *adopted*, 2011 WL 2160466 (S.D. Ohio June 1, 2011).

In any event, upon review of the trial transcript, the undersigned agrees with the Ohio court's determination that the ground for relief lacks merit. Petitioner has not demonstrated that any of the cited "errors" actually amounted to error, much less warranted the reversal of his conviction or otherwise deprived him of a fair trial. Moreover, petitioner has not demonstrated that he is entitled to relief on any of the claims alleged as grounds for relief in the instant petition. Even assuming, without deciding, that some of the additional allegations of error listed in Ground Seven may have merit, given the overwhelming evidence of guilt that was properly introduced at trial, it is highly unlikely that those errors either individually or collectively had a substantial and injurious effect or influence on the jury in this case. *See Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).

Therefore, petitioner is not entitled to federal habeas relief based on the cumulative error claim alleged in Ground Seven.

**G.  Petitioner Is Not Entitled To Relief Based On The Claim In Ground Eight Challenging His Consecutive Sentences For Aggravated Murder And Tampering With Evidence**

In Ground Eight of the petition, petitioner claims that he was improperly sentenced to consecutive terms of imprisonment on the aggravated murder and tampering-with-evidence charges because he "had not previously been in prison or even convicted of a felony" and, therefore, "was entitled to the minimum sentence within the range authorized by statute."  (Doc. 1, p. 12).  The Ohio Court of Appeals rejected the claim, which was raised as an assignment of error on direct appeal; the court reasoned that following the Ohio Supreme Court's decision in *State v. Foster,* 845 N.E.2d 470 (Ohio 2006), "a trial court has discretion to sentence a defendant to any amount of time allowed by statute," and petitioner's "sentences were within the statutory range."  (Doc. 9, Ex. 22, p. 18).

As discussed above, this Court is precluded from reviewing petitioner's claim to the extent petitioner alleges that the trial court erred under Ohio law in imposing consecutive terms of imprisonment.  *See* 28 U.S.C. § 2254(a); *see also Wilson v. Corcoran,* __ U.S. __, 131 S.Ct. 13, 16 (2010); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *cf. Sneed v. Donahue,* 993 F.2d 1239, 1244 (6th Cir. 1993) (holding that a claim challenging the petitioner's aggregate sentence under state law "involves a matter of state law," which "is not cognizable in a federal habeas corpus proceeding").

The Court only has jurisdiction on habeas review to consider whether the alleged error in sentencing violated petitioner's constitutional rights.  However, the Supreme Court has made it clear that consecutive sentences may be imposed without implicating any concerns under the Sixth Amendment.  *Oregon v. Ice*, 555 U.S. 160, 168-72 (2009).  Moreover, it is clear from the

record that petitioner was sentenced within the statutory range on both the aggravated murder and tampering-with-evidence charges, after consideration by the trial court of the parties' arguments and witness testimony presented at the sentencing hearing.  (*See* Doc. 9, Trial Tr. 2016-31).  Therefore, petitioner is unable to prevail on any claim of cruel and unusual punishment under the Eighth Amendment.  *Cf. Bryant v. Yukins,* 39 F. App'x 121, 123 (6th Cir. 2002) (quoting *Austin v. Jackson,* 213 F.3d 298, 302 (6th Cir. 2000), in turn quoting *United States v. Organek,* 65 F.3d 60, 62 (6th Cir. 1995)).

Accordingly, in the absence of any showing of constitutional error, petitioner is not entitled to habeas relief based on the claim alleged in Ground Eight challenging his consecutive prison sentences for aggravated murder and tampering with evidence.

### IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2.  A certificate of appealability should not issue with respect to the claim alleged in Ground Three of the petition, which this Court has concluded is barred from review on procedural waiver grounds, because under the first prong of the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.[11]

A certificate of appealability also should not issue with respect to the non-defaulted claims alleged in the remaining grounds for relief because petitioner has not made a substantial showing that he has stated a "viable claim of the denial of a constitutional right" or that the

---

[11]Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in Ground Three.  *See Slack,* 529 U.S. at 484.

50

issues presented in the remaining grounds are "adequate to deserve encouragement to proceed further."  *See Slack,* 529 U.S. at 475 (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and, therefore, should **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:  9/29/11                                     s/Karen L. Litkovitz
           cbc                                  Karen L. Litkovitz
                                        United States Magistrate Judge

# UNITED  STATES  DISTRICT  COURT
## SOUTHERN  DISTRICT  OF  OHIO
## WESTERN  DIVISION

DAVID CRAWFORD,                                    Case No. 1:10-cv-541
     Petitioner,

                                     Barrett, J.
     vs                                            Litkovitz, M.J.

WARDEN, WARREN CORRECTIONAL
INSTITUTION,
     Respondent.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

David Crawford # 566-073
Warren Corr. Inst.
PO Box 120
State Route 63
Lebanon, OH 45036

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☑ Agent ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7003 2260 0002 6723 4132

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540